396 A.2d 1205

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL RESOURCES, Appellant,**

v.

**LOCUST POINT QUARRIES, INC., Appellee.**

Supreme Court of Pennsylvania.

Argued Nov. 14, 1978.

Decided Jan. 24, 1979.

---

352

Robert E. Yuhnke, Eugene E. Dice, Asst. Attys. Gen., Harrisburg, for appellant.

John M. Eakin, Mechanicsburg, for appellee.

Before EAGEN, C. J., and ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

Appellee, Locust Point Quarries, Inc. (Quarry) was charged with four counts of violating 25 Pa.Code § 123.1,[1] a regulation of appellant, Commonwealth of Pennsylvania, Department of Environmental Resources. Section 4008 of the Air Pollution Control Act[2] provides that failure to comply with a regulation adopted pursuant to the Act shall be unlawful, and Section 4009(a) sets forth penalties for conviction of summary offenses which include offenses defined in Section 4008. After a hearing before a district justice in Hampden Township, Quarry was convicted on all four counts, and the court imposed a $2,000 fine and costs.[3] Quarry appealed from the decision pursuant to Pa.R.Crim.P. 67 and received a de novo hearing in the Court of Common Pleas of Cumberland County in July of 1975.

1. The regulation in effect at the time of prosecution, in pertinent part, provided:
 "(a) No person shall cause, suffer, or permit the emission into the outdoor atmosphere of any fugitive air contaminant from any source other than the following:
 (1) The construction or demolition of buildings or structures.
 (2) The grading, paving, and maintenance of roads and streets.
 (3) The use of roads and streets. Emissions from material in or on trucks, railroad cars, and other vehicular equipment shall not be considered as emissions from use of roads and streets.
 (4) The clearing of land.
 (5) Tilling or applying amendments to the soil, preparing cover crops for incorporation into the soil and harvesting, while farming.
 (6) The stockpiling of materials.
 (7) Open burning operations.
 (8) Blasting in open pit mines. Emissions from drilling shall not be considered as emissions from blasting.
 (9) Other sources and classes of sources determined by the Department to be of minor significance with respect to the achievement and maintenance of ambient air quality standards or with respect to causing air pollution."

2. Act of January 8, 1960, P.L. (1959) 2119, § 1 *et seq.*, as amended, 35 P.S. § 4001 *et seq.*

3. The case against Mr. Forrest G. Brenneman, Vice-President of Quarry, was dismissed. The Department took no appeal from that dismissal.

After the Commonwealth presented its testimony to the court, Quarry demurred to the evidence. The court sustained the demurrer, holding that, although the Commonwealth witnesses had observed and documented violations of the regulation in the nature of fugitive emissions, the Commonwealth failed to prove an essential element of the cause of action, namely that these emissions had caused or contributed to a condition of air pollution. *Commonwealth v. Locust Point Quarries, Inc.*, 26 Cumb. 20, 72 Pa.D. & C.2d 700 (1975).

·The Commonwealth appealed from the order of the Court of Common Pleas to the Commonwealth Court which held a violation of Section 123.1 had been proven. However, the court construed the Department of Environmental Resources regulations to require that Sections 123.1 and 123.-13 [4] be read together and, after finding a failure to prove a violation of Section 123.13, affirmed the order of the Court of Common Pleas. *Commonwealth v. Locust Point Quarries, Inc.*, 27 Pa.Cmwlth. 270, 367 A.2d 392 (1976).

The Commonwealth filed a petition for allowance of appeal to this Court. The petition was granted.

The factual background is as follows:

Robert M. Fink, an "environmental protection specialist" with the Department of Environmental Resources, Bureau of Air Quality and Noise Control, visited Quarry to evaluate air contaminant emissions on four separate days: August 21, 1974, August 26, 1974, August 28, 1974, and September 10, 1974. On each occasion, after obtaining permission to survey the operation, he observed fugitive dust emissions [5] from

4. Section 123.13 provides a formula for evaluating particulate matter emissions from "processes" and a chart which supplies one of the variables for the formula for each specific "process."

5. 25 Pa.Code § 121.1 sets forth the following definitions:
"Emissions—Air contaminants emitted into the outdoor atmosphere.
Fugitive Air Contaminant—Any air contaminant emitted into the outdoor atmosphere in any manner other than through a flue.
Flue—Any duct, pipe, stack, chimney, or conduit permitting air contaminants to be emitted into the outdoor atmosphere which is

several areas of the limestone processing facilities.[6] Since the action was terminated in the Court of Common Pleas before Quarry presented any evidence, no factual disputes are presently involved. Rather, the controversy centers on the proper construction to be given the version of 25 Pa. Code § 123.1 in effect at the time of the alleged violations.[7]

The Commonwealth contends sufficient evidence to support a conviction for violation of Section 123.1 was presented. Quarry contends that regulation standing alone is unreasonable and is defective unless read together with 25 Pa.Code § 123.13. In the alternative, Quarry urges the construction of Section 123.1 adopted by the trial court, namely fugitive emissions must be proven to cause or contribute to a condition of air pollution if they are to give rise to criminal liability.

The Commonwealth Court held that Section 123.13 of the regulations could not be said with certainty to exclude fugitive emissions of particulate matter from its scope, and that it, read together with Section 123.1, would therefore be applicable to fugitive emissions of dust. This conclusion is erroneous for several reasons.

First, it does not comport with principles set forth in the Statutory Construction Act.[8] Section 1924 of that Act provides the headings affixed to divisions of regulations, while

of such a nature as to permit the performance of the test methods and procedures specified in Chapter 139 of this Title (relating to sampling and testing)."

**6.** Quarry is an industry which blasts and removes limestone from the ground and then processes it. Limestone is crushed, screened, and sorted based on size for storage in bins or piles. Fugitive emissions were observed variously coming from: the area of the primary crusher; the secondary crusher; the transfer point between the primary and secondary crushers; the building which houses the screens, storage bins, hammer mill and bucket elevator; a truck loading area; and, the area where euclid trucks dump limestone into the primary crusher.

**7.** Section 123.1 has since been amended. See n.23, *infra.*

**8.** 1 Pa.C.S.A. § 1501 *et seq.* The Act is made applicable to regulations codified in the Pennsylvania Code in 1 Pa.C.S.A. § 1502(a)(1)(ii). See 1 Pa.Code § 1.7.

not controlling, are a useful aid in construction. The headings of the divisions of Chapter 123 of Title 25 of the Pennsylvania Code clearly separate "fugitive emissions" from "particulate matter emissions."[9] Further, while the definitional provisions of the regulations do not exclude fugitive air contaminants from the definition of particulate matter, they also do not define fugitive air contaminants in terms of particulate matter only.[10] Thus, neither term subsumes the other with regard to the material emitted since a fugitive air contaminant is set apart as *any* air contaminant emitted other than through a flue. Thus, a fugitive emission is an emission of *any* air contaminant in a specific manner, and the term is applicable not just to particulate matter, but also to sulfur compound, odor, and visible emissions if emitted other than through a flue. Section 1933 of the Statutory Construction Act provides that, when a general provision and special provision of a statute are in conflict, the two shall be construed, if possible, so as to give effect to both. Therefore, the special treatment accorded by the regulations to emission of fugitive air contaminants must be given deference. This conclusion is further supported by Section 1921(a) of the Statutory Construction Act, which provides that a statute is to be construed, if possible, to give effect to all of its provisions. The construction adopted by the Commonwealth Court would render Section 123.1 ineffectual and is, therefore, unacceptable.

Policy considerations as well suggest the rulemakers intended a special regulation for fugitive emissions. Approval of the State Implementation Plan required by the federal

**9.** See 25 Pa.Code, Chapter 123: Standards for Contaminants. The headings divide the Chapter into the following Sections: Fugitive Emissions; Particulate Matter Emissions; Sulfur Compound Emissions; Odor Emissions; and, Visible Emissions.

**10.** 25 Pa.Code § 121.1 defines particulate matter as any material, except uncombined water, which is or has been airborne and exists as a solid or liquid at 70°F. and 14.7 pounds per square inch absolute pressure. For the definition of fugitive air contaminant, see n. 5, supra.

Clean Air Act [11] is contingent upon inclusion in the plan of requirements for installation of equipment by owners and operators of stationary sources to monitor emissions from those sources.[12] To that effect, Section 4004(2.2) of the Air Pollution Control Act places a duty on the Department of Environmental Resources to require the owner or operator of an air contamination source to install, use, and maintain air contaminant monitoring equipment as the Department may prescribe. Section 4005 of the Act empowers the Environmental Quality Board to adopt rules and regulations prohibiting or regulating any process or source and requiring installation of specified control devices or equipment. Section 123.1 is a technology-forcing regulation, that is, it evidences an intent to pressure owners and operators of sources to either eliminate unmeasurable emissions or to make them measurable. In light of the policy in favor of making emissions of air contaminants measurable and the uncontroverted testimony of two Commonwealth witnesses that rates of fugitive emissions are not measurable by any existing scientific device, the rulemakers clearly intended Section 123.1 to stand alone.

Finally, the Department of Environmental Resources amended 25 Pa.Code § 121.8 subsequent to this controversy "[t]o *clarify* the meaning in light of a recent Commonwealth Court decision which did not construe that section in the way the agency intended it to be construed." [13] [Emphasis

11. 42 U.S.C.A. § 7401 *et seq.* (Supp.1978) [formerly 42 U.S.C.A. § 1857 *et seq.*]. Section 7410 requires each state to submit an implementation plan to the Administrator of the Environmental Protection Agency (E.P.A.) setting forth the means by which the state will meet the national primary and secondary ambient air quality standards prescribed by the Administrator pursuant to Section 7409. The Pennsylvania plan includes the Air Pollution Control Act and regulations thereunder. The plan was approved by the E.P.A. Administrator on May 31, 1972. See 40 C.F.R. Part 52, Subpart NN, Section 52.2020 *et seq.* (1972). Failure of a state to enforce its own plan could result in federal enforcement of the plan under Section 7413 of the Clean Air Act.

12. 42 U.S.C.A. § 7410(a)(2)(F)(ii) [formerly 42 U.S.C.A. § 1857c–5(a)(2)(F)(ii)].

13. 7 Pa.B. 2251. The amendment became effective August 29, 1977.

added.] The amendment specifically directs compliance with Section 123.1 without regard to §§ 123.11–123.13.[14] Clearly, the prohibition of fugitive emissions was intended to be effective independent of Section 123.13.

Quarry urges, as an alternative, the construction adopted by the trial court, namely that the Commonwealth must prove the emissions in question caused or contributed to a condition of air pollution. This construction is also unacceptable, once the regulation is considered in the proper context.

 The Commonwealth is committed to the conservation and maintenance of clean air by Art. I, § 27 of the Pennsylvania Constitution.[15] To that effect, through Section 4002 of the Air Pollution Control Act, the legislature has declared as policy the protection of air resources to the degree necessary for the protection of the health, safety and well-being of the citizens; the prevention of injury to plant and animal life and property; the protection of public comfort and convenience and Commonwealth recreational resources; and the development, attraction and expansion of industry, commerce, and agriculture. In sum, protection of air resources is a matter of highest priority in the Commonwealth. See *Commonwealth v. Bethlehem Steel Corporation*, 469 Pa.

14. The text of the current rule, published at 7 Pa.B. 1932 is as follows:

"Compliance with any provision of this Title shall not relieve any person of the responsibility to comply with any other provision of this Title, except when such relief has been clearly provided for in this Title. Unless explicit reference is made to another section, each section of this Title shall be construed and enforced according to its own terms. Thus, for example and without limitation on the general application of this section, compliance with both § 123.1 of this Title (relating to prohibition of certain fugitive emissions) and § 123.41 of this Title (relating to limitations) must be attained whether or not emissions comply with §§ 123.11–123.13 of this Title (relating to particulate matter emissions). Compliance with each and every section of this Title must be independently determined."

15. Adopted May 18, 1971. "The people have a right to clean air . . .. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all people."

578, 367 A.2d 222 (1976), cert. denied, 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 804 (1977).

Moreover, the United States Congress has developed a national policy of air cleanup and protection which is implemented by the Clean Air Act.[16] After several attempts to gain the voluntary cooperation of the states in attacking the deteriorating quality of the ambient air failed, the Act was amended in 1970 to establish national ambient air quality standards. The states were required to submit plans for achieving those standards within a prescribed time period to the E.P.A. Administrator for approval. Pennsylvania's Air Pollution Control Act and the regulations promulgated pursuant to the Act are the mechanism by which the Commonwealth plans to meet its responsibilities. The amendments reflect the seriousness of the Congressional intent to reduce the threat to public health and safety posed by air pollution. They are a "drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution," *Union Electric Company v. E. P. A.*, 427 U.S. 246, 256, 96 S.Ct. 2518, 2525, 49 L.Ed.2d 474 (1976), and were intended to "tak[e] a stick to the States." *Train v. Natural Resources Defense Council*, 421 U.S. 60, 64, 95 S.Ct. 1470, 1474, 43 L.Ed.2d 731 (1975). The requirements of the amendments "are of a 'technology-forcing character,' and are expressly designed to force regulated sources to develop pollution control devices that might at the time appear to be economically or technologically infeasible." *Union Electric v. E. P. A.*, 427 U.S. supra at 257, 96 S.Ct. at 2525. [Citation omitted.] The federal regulations under the Act place a duty in certain instances on the states to formulate a "control strategy" as part of the state implementation plan which takes future increases in air contaminants into account in its formulation of current pollution control measures.[17]

16. See n. 11, supra.

17. 40 C.F.R. § 51.12(a): "In any region where existing (measured or estimated) ambient levels of a pollutant exceed the levels specified by an applicable national standard, the plan shall set forth a control

The complexity of the problems to be solved and the need for a broad control strategy dictate decisions must be made by those possessing the necessary technical expertise. In the instant case, the Department of Environmental Resources is responsible for formulation, implementation, and enforcement of the state plan. "Courts are not scientific experts in the field of air pollution and should not be called upon to solve the scientific problems which the regulators and regulated should solve." *Commonwealth v. United States Steel Corporation*, 15 Pa.Cmwlth. 184, 190, 325 A.2d 324, 328 (1974). The administrative process provides for public comment and public hearings at the stage when adoption of regulations is being considered and intervention of affected parties would be most fruitful.[18] When the Environmental Quality Board promulgated the regulation [19] prohibiting certain fugitive emissions, it had already made a determination that such emissions cause or contribute to a condition of air pollution.

Because regulations implementing the Air Pollution Control Act are promulgated pursuant to a grant of legislative power, they enjoy a presumption of reasonableness. The courts have refused to substitute their own judgment for that of agencies possessing technical expertise absent a showing the agency arbitrarily and unreasonably exercised the police power. See *Commonwealth v. Harmar Coal Company*, 452 Pa. 77, 306 A.2d 308 (1973). The regulation in question, Section 123.1, is reasonably understandable and

strategy which shall provide for the degree of emission reduction necessary for attainment and maintenance of such national standard, including the degree of emission reduction necessary to offset emission increases that can reasonably be expected to result from projected growth of population, industrial activity, motor vehicle traffic, or other factors that may cause or contribute to increase emissions."

18. See Commonwealth Documents Law, Act of July 31, 1968, P.L. 769, No. 240, art. II, §§ 201, 202, 45 P.S. §§ 1201, 1202 (Supp.1978), and Air Pollution Control Act, 35 P.S. § 4007.

19. The powers and responsibilities of the Board are set forth in the Administrative Code, Act of April 9, 1929, P.L. 177, Art. XIX–A, § 1920–A, added December 3, 1970, P.L. 834, No. 275, § 20, effective January 19, 1971, 71 P.S. § 510–20 (Supp.1978).

specific, and its publication gave notice to the citizens of the Commonwealth. Aside from enumerated exceptions, fugitive emissions are prohibited because the Board determined they cause air pollution.

Therefore, Quarry's challenge to the sufficiency of the evidence must fail. The Commonwealth presented two witnesses, "environmental protection specialists," who testified to visual observations of fugitive emissions from the quarry operation and also presented three photographic exhibits. The Commonwealth Court has ruled that, if scientific tests are available, fairness requires they be used to measure the rate of emissions from a source, but, when no such tests are available,[20] proof of violations must depend upon the weight of the evidence produced. Compare *Bortz Coal Company v. Commonwealth*, 2 Pa.Cmwlth. 441, 279 A.2d 388 (1971), appeal after remand, 7 Pa.Cmwlth. 362, 299 A.2d 670 (1973) [Commonwealth may not establish violation by visual observations of employee when scientific tests are available] with *Rushton Mining Co. v. Commonwealth*, 16 Pa.Cmwlth. 135, 328 A.2d 185 (1974) [scientific evidence not exclusive means of proving violation of air pollution regulation].

Underlying Quarry's contentions regarding the proper construction of Section 123.1 is the assumption that the regulation standing alone is unreasonable; however, Quarry has not properly challenged the reasonableness of the regulation. A proper challenge would allege the regulation is not rationally related to the legitimate state objectives set forth in Section 4002 of the Air Pollution Control Act and mandated by the Clean Air Act Amendments.[21] Such a challenge must be based upon a claim that the regulation is "unnecessarily stringent and unnecessary for the protection of the public health, safety and welfare."

20. The Commonwealth witnesses testified there are no scientific measuring devices to monitor the rate of fugitive emissions. The testimony was uncontroverted. High volume air samplers used to monitor particulate matter must be installed on flues. See 40 C.F.R. Part 50, Appendix B, for technical data.

21. The national ambient air quality standards have been adopted as D.E.R. standards. 25 Pa.Code § 131.1–131.4.

*Rochez Bros., Inc. v. Commonwealth, Department of Environmental Resources*, 18 Pa.Cmwlth. 137, 146, 334 A.2d 790, 795 (1975). Quarry would have to present evidence to establish that the regulation, *per se* or as applied, will not aid in reaching mandated national ambient air quality standards and that the proscribed activity is insignificant as a cause of air pollution.[22] Any party asserting a statute or regulation is an unreasonable exercise of the police power must meet a heavy burden of proof.[23]

**22.** We note even evidence that the regulation will destroy a business may be unavailing standing alone. See *Union Electric Company v. E.P.A.*, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976); *Rochez Bros., Inc. v. D.E.R.*, 18 Pa.Cmwlth. 137, 334 A.2d 790 (1975); *Bortz Coal Company v. Commonwealth*, 2 Pa.Cmwlth. 441, 279 A.2d 388 (1971), appeal after remand, 7 Pa.Cmwlth. 362, 299 A.2d 670 (1973).

**23.** Section 123.1 has now been amended to provide for application to the Department of Environmental Resources for exemption from the prohibition of fugitive emissions under such conditions and limitations as the Department shall prescribe.

7 Pa.B. 2251–52. Proposed amendments were published with notice of public hearings and instructions for submission of written comments at 7 Pa.B. 660–666. Corrections appear at 7 Pa.B. 909. The revised text of the amended regulations appears at 7 Pa.B. 1931–38. The regulation, in pertinent part, now provides:

"(a) No person shall cause, suffer, or permit the emission into the outdoor atmosphere of any fugitive air contaminant from any other than the following:

\* \* \* \* \* \*

(9) Sources and classes of sources, other than those identified in paragraphs (1)–(8) of this subsection, for which the operator has obtained a determination from the Department that fugitive emissions from the source, after the appropriate control meet the following requirements:

(i) the emissions are of minor significance with respect to causing air pollution; and

(ii) the emissions are not preventing or interfering with the attainment or maintenance of any ambient air quality standard.

"(b) Application forms for requesting a determination under . . . subsection (a)(9) of this section . . . are available from the Department. In reviewing such applications, the Department may require the applicant to supply information including, but not limited to, a description of proposed control measures, characteristics of emissions, quantity of emissions, and ambient air quality data and analysis showing the impact of the source on ambient air quality. The applicant shall be required to demonstrate that the requirements of subsections (a)(9) and (c) of this section and § 123.2 of this Title (relating to fugitive particulate

The order of the Commonwealth Court is vacated and the record is remanded to the trial court for further proceedings consistent with this opinion.

POMEROY, former J., did not participate in the consideration or decision of this case.

O'BRIEN, J., did not participate in the decision of this case.

matter) . . . have been satisfied. Upon such demonstration, the Department will issue a determination, in writing, either as an operating permit condition, for those sources subject to permit requirements under the act, or as an order containing appropriate conditions and limitations."

See also 35 P.S. § 4006 and 25 Pa.Code § 121.6.